UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 JAN 29 PM 3:54

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO

| | |
|---|---|
| IN RE APPLICATION OF THE ) | |
| UNITED STATES OF AMERICA FOR ) | MISC. NO. ___3:18 mj 051___ |
| AN ORDER PURSUANT TO ) | |
| 18 U.S.C. § 2703(d) ) | **Filed Under Seal** |

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully

submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The

proposed Order would require **T-MOBILE**, a cellular service provider, located in Parsipanny,

New Jersey, to disclose certain records and other information pertaining to the cellular telephone

assigned call number **270-363-8919**, as described in Part I of Attachment A to the proposed Order.

The records and other information to be disclosed are described in Part II of Attachment A. In

support of this application, the United States asserts:

LEGAL BACKGROUND

1.      **T-MOBILE** is a provider of an electronic communications service, as defined in

18 U.S.C. § 2510(15). Accordingly, the United States may use a court order issued under

§ 2703(d) to require **T-MOBILE** to disclose the items described in Part II of Attachment A, as

these records pertain to a subscriber of electronic communications service and are not the contents

of communications. *See* 18 U.S.C. § 2703(c)(1).

2.      This Court has jurisdiction to issue the proposed Order because it is "a court of

competent jurisdiction," as defined in 18 U.S.C. § 2711(3). *See* 18 U.S.C. § 2703(d). Specifically,

the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3.      A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

<u>THE RELEVANT FACTS</u>

4.      The United States is investigating interstate travel or transportation in aid of racketeering (ITAR), firearms, witness intimidation, unlawful flight to avoid prosecution (UFAP), conspiracy, kidnapping, and other related offenses committed by STERLING ROBERTS, TAWNNEY CALDWELL (also known as TAWNNEY THOMAS), CHANDRA HARMON, JAMES HARMON, CHANCE DEAKIN (also known as CHANCE ROBERTS), CHRISTOPHER ROBERTS and others unknown. The offenses relate to events surrounding the homicide of ROBERT CALDWELL. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 1952 (ITAR), 18 U.S.C. § 924(c) (use of a firearm during and relation to a crime of violence), 18 U.S.C. § 922(d) (sale or transfer of a firearm to a prohibited person), 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), 18 U.S.C. § 1512 (tampering with a witness, victim, or informant), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 373 (solicitation to commit an offense), 18 U.S.C. § 1073 (UFAP) and 18 U.S.C. § 1201 (kidnapping).

5.    On August 15, 2017, at approximately 5:57 p.m., ROBERT CALDWELL and his three minor children left a counseling appointment at 4134 Linden Avenue in Riverside, Ohio. While crossing the parking lot, ROBERT CALDWELL was shot multiple times by an assailant in front of his children. ROBERT CALDWELL died at the scene. As detailed below, the assailant was later identified as STERLING ROBERTS. Based on the investigation conducted to-date, as detailed below, there is probable cause to believe that STERLING ROBERTS, TAWNNEY CALDWELL (also known as TAWNNEY THOMAS), CHANDRA HARMON, JAMES HARMON, CHANCE DEAKIN (also known as CHANCE ROBERTS), CHRISTOPHER ROBERTS and others unknown, conspired together to plan, execute, and/or cover-up of the violent crime resulting in the death of ROBERT CALDWELL. The conspiracy includes but is not limited to obtaining weapons, vehicles, cellular telephones, and other instrumentalities used before, during, and after the crime; concealing STERLING ROBERTS' whereabouts; assisting STERLING ROBERTS in fleeing to avoid prosecution; destroying or attempting to destroy evidence; and intimidating witnesses. In carrying out the conspiracy, some of the co-conspirators traveled interstate and/or assisted others in interstate travels.

6.    By way of background, below is a summary of the relationships of the aforementioned individuals:

   a.    ROBERT CALDWELL and TAWNNEY CALDWELL were married in approximately 2009. They had three children together, who will be referred to for purposes of this Affidavit as "Minor Male A", age 15; "Minor Male B", age 14; and "Minor Male C", age 9. ROBERT CALDWELL and TAWNNEY CALDWELL were divorced in 2012. At that time, TAWNNEY CALDWELL was designated as the custodial and residential parent of the three sons, and ROBERT CALDWELL was awarded visitation rights. TAWNNEY CALDWELL currently resides at 2006 Washington Creek Lane in Centerville, Ohio.

3

b.     From approximately 2013 to the present, TAWNNEY CALDWELL had a romantic relationship with STERLING ROBERTS. They had two biological daughters together (one of whom was born in December 2017) and sometimes lived together at TAWNNEY CALDWELL's residence in Centerville, Ohio.

c.     CHANCE DEAKIN and CHRISTOPHER ROBERTS are STERLING ROBERTS' brothers. They currently reside at 36 Virginia Avenue in Dayton, Ohio.

d.     CHANDRA HARMON is TAWNNEY CALDWELL's mother. CHANDRA HARMON is married to JAMES HARMON, and they currently reside together at 6278 Rogers Lane in Burlington, Kentucky.

e.     JEANINE ROBERTS is the mother of STERLING ROBERTS, CHANCE DEAKIN, and CHRISTOPHER ROBERTS. She currently resides in Nashville, Tennessee.

7.     Also by way of background, STERLING ROBERTS and CHRISTOPHER ROBERTS have previously been convicted of felony offenses punishable by imprisonment exceeding one year. As such, they are prohibited from possessing firearms.

8.     Beginning in or around 2013, there has been an ongoing dispute between ROBERT CALDWELL and TAWNNEY CALDWELL regarding the custody of their three children. The dispute was litigated in the Montgomery County, Ohio Common Pleas Court, Division of Domestic Relations.

a.     ROBERT CALDWELL has filed motions over the years alleging that TAWNNEY CALDWELL has consistently interfered with his parental visitations of their children. The Magistrate Judge found TAWNNEY CALDWELL in contempt of court on two occasions for interfering with ROBERT CALDWELL's parental rights.

b.     TAWNNEY CALDWELL has also filed motions where she alleged that the children were not adjusting well to ROBERT CALDWELL as a parent, were doing poorly in school, and were unhappy. TAWNNEY CALDWELL also alleged that ROBERT CALDWELL was abusing the children. These issues were examined during a hearing on or around May 10, 2017, and were determined to be unfounded by the Magistrate Judge.

c.     In an order filed on or around July 29, 2017, the Magistrate Judge designated ROBERT CALDWELL as the custodial and residential parent for the three children. The Magistrate Judge noted in the order that TAWNNEY CALDWELL lacked credibility and failed to demonstrate a "willingness or ability to actually

4

facilitate parenting time" with ROBERT CALDWELL and "is at worst absent and at best simply not up to the job at hand". Furthermore, the Magistrate Judge reiterated a previous order that STERLING ROBERTS should not have contact with the children.

9.      Records received from First Choice Auto in Middletown, Ohio revealed that TAWNNEY CALDWELL purchased a grey 2003 Mitsubishi Eclipse on or around July 27, 2017. The salesman for the transaction identified that a man resembling STERLING ROBERTS in appearance was with TAWNNEY CALDWELL when she made the purchase, and that he drove the vehicle when they left the store. The vehicle was paid for in part with a Chase Bank Visa debit card in TAWNNEY CALDWELL's name, with the remainder paid for in cash.

10.     As part of the investigation, a report was obtained from the Greene County (Ohio) Sheriff's Office regarding an alleged incident occurring between ROBERT CALDWELL and STERLING ROBERTS in Jamestown, Ohio on or around August 5, 2017. Review of this report provided the following information:

    a.    ROBERT CALDWELL reported that on or around August 1, 2017, he began receiving text messages from telephone number 937-825-5688. In these messages, the person claimed to be "Debbie Brown" and asked to hire ROBERT CALDWELL to perform stone work at her house in Jamestown, Ohio. After an exchange of messages, ROBERT CALDWELL agreed to meet "Debbie Brown" at a residence in Jamestown on or around August 5, 2017.

    b.    After ROBERT CALDWELL drove to the designated location, he found that it appeared to be an abandoned residence. STERLING ROBERTS arrived shortly thereafter in a grey Mitsubishi Eclipse with Ohio temporary tags. The registration information for the vehicle's temporary tags matched the vehicle purchased by TAWNNEY CALDWELL a few weeks prior. STERLING ROBERTS reached toward his waistband and said "what's up Bobby, you ready to die" (or words to that effect). ROBERT CALDWELL fled the scene, chased by STERLING ROBERTS. ROBERT CALDWELL pulled over at one point, and STERLING ROBERTS got out of his vehicle and approached ROBERT CALDWELL. ROBERT CALDWELL saw the handle of what he believed to be a gun in STERLING ROBERTS' waistband, and ROBERT CALDWELL again fled the scene.

c.    ROBERT CALDWELL was eventually able to escape from the chase and reported the matter to the Greene County Sheriff's Office. On or around August 8, 2017, ROBERT CALDWELL was granted a Civil Stalking Protection Order against STERLING ROBERTS by the Greene County, Ohio Common Pleas Court, Domestic Relations Division.

11.    As part of the investigation, an adult female who will be referred to for purposes of this Affidavit as "Female A" (whose true identity is known) was personally interviewed by law enforcement officers. Female A identified that she spent time with STERLING ROBERTS approximately one to two weeks before ROBERT CALDWELL was murdered. Based on review of Female A's telephone, investigators determined that she spent time with STERLING ROBERTS during the approximate time period of August 6 to 8, 2017 (beginning one day following the confrontation between STERLING ROBERTS and ROBERT CALDWELL in Jamestown, Ohio). In summary, Female A provided the following information during the interview:

a.    During the time she spent with STERLING ROBERTS, he was using methamphetamine.

b.    STERLING ROBERTS told Female A that he was going to kill ROBERT CALDWELL.

c.    STERLING ROBERTS drove a Mitsubishi Eclipse (consistent with the vehicle purchased by TAWNNEY CALDWELL in July 2017). Female A observed STERLING ROBERTS with a handgun that she described as being black and silver in color on two to three occasions when they were in his vehicle. STERLING ROBERTS told Female A that he "stole" the gun from his brother. On one occasion, Female A observed STERLING ROBERTS point the gun at another man after this man called Female A an obscene name.

d.    On one occasion when Female A was driving with STERLING ROBERTS in the Mitsubishi Eclipse, STERLING ROBERTS was concerned that he was being followed by someone. STERLING ROBERTS abandoned the Mitsubishi Eclipse in a church parking lot and thereafter abandoned the cellular telephone he was using at the time in a used tire store (both located in Dayton, Ohio).

e.    After abandoning his vehicle and cellular telephone, STERLING ROBERTS' mother (JEANINE ROBERTS) picked him up and took him to Tennessee. TAWNNEY CALDWELL thereafter began contacting Female A via Facebook

and/or cellular telephone and asking where STERLING ROBERTS' gun, vehicle, and cellular telephone were. TAWNNEY CALDWELL eventually met Female A at the house where STERLING ROBERTS' brothers lived (36 Virginia Avenue in Dayton, Ohio). STERLING ROBERTS' brother, the brother's girlfriend, and another unknown female were present during this meeting. During the meeting, Female A told TAWNNEY CALDWELL the location where STERLING ROBERTS abandoned his vehicle and cellular telephone.

12.     An associate of STERLING ROBERTS who will be referred to for purposes of this Affidavit as "Female B" (whose true identity is known) was interviewed as part of the investigation by law enforcement officers. Consistent with the information provided by Female A about STERLING ROBERTS going to Tennessee, Female B advised that she received a telephone call from STERLING ROBERTS on or around August 8, 2017. STERLING ROBERTS called from his mother's cellular telephone number and told Female B that he was in Nashville, Tennessee. STERLING ROBERTS talked about how TAWNNEY CALDWELL blamed him for losing custody of her sons and told him that the only way to fix the situation was to "get rid of" ROBERT CALDWELL. STERLING ROBERTS commented that it was all part of "TAWNNEY's plan". STERLING ROBERTS also talked about the confrontation in Jamestown, Ohio, and said that he was "screwed up".

13.     JEANINE ROBERTS was interviewed as part of the investigation. Consistent with the information provided by Female A and Female B, JEANINE ROBERTS advised that STERLING ROBERTS had stayed with her in Tennessee in August 2017, shortly before the homicide of ROBERT CALDWELL. JEANINE ROBERTS stated that she picked up STERLING ROBERTS at CHANCE DEAKIN's and CHRISTOPHER ROBERTS' residence in Dayton, Ohio and drove STERLING ROBERTS to Tennessee. Below is a summary of other information provided by JEANINE ROBERTS during the interviews:

a.     STERLING ROBERTS was addicted to methamphetamine. TAWNNEY CALDWELL introduced STERLING ROBERTS to his source of supply for narcotics.

b.     JEANINE ROBERTS described TAWNNEY CALDWELL as being controlling of STERLING ROBERTS. JEANINE ROBERTS overheard conversations where TAWNNEY CALDWELL said that she wanted STERLING ROBERTS to kill ROBERT CALDWELL so that they could be together. JEANINE ROBERTS also overheard conversations where TAWNNEY CALDWELL inquired about hiring a hitman to kill ROBERT CALDWELL. One of these conversations occurred in February 2017.

c.     While they traveled from Ohio to Tennessee in August 2017, STERLING ROBERTS told JEANINE ROBERTS about the confrontation he had with ROBERT CALDWELL in Jamestown, Ohio. STERLING ROBERTS said that he used the name "Debbie" (referring to Debbie Brown) because this was a name that TAWNNEY CALDWELL used when engaging in prostitution services. STERLING ROBERTS admitted that he lured ROBERT CALDWELL to Jamestown, Ohio. However, STERLING ROBERTS told JEANINE ROBERTS that he only intended to fight with ROBERT CALDWELL and did not plan to kill him. JEANINE ROBERTS overheard a telephone call that STERLING ROBERTS had with ROBERT CALDWELL about this confrontation (which is consistent with the recording provided by ROBERT CALDWELL's wife).

d.     During the time that STERLING ROBERTS stayed with JEANINE ROBERTS in August 2017, he talked about needing to get away from TAWNNEY CALDWELL and being afraid of her.

e.     TAWNNEY CALDWELL traveled to Tennessee to pick up STERLING ROBERTS and bring him back to Ohio. JEANINE ROBERTS sent a text message to TAWNNEY CALDWELL providing the address to JEANINE ROBERTS' residence. TAWNNEY CALDWELL drove her Dodge Durango to Tennessee. While in Tennessee, TAWNNEY CALDWELL talked about how her future did not include STERLING ROBERTS. TAWNNEY CALDWELL talked about storing STERLING ROBERTS' vehicle in her garage.

f.     After ROBERT CALDWELL was murdered, JEANINE ROBERTS talked to STERLING ROBERTS on the telephone. STERLING ROBERTS denied that he killed ROBERT CALDWELL but said that he was "on the run" because law enforcement officers thought he had done so.

g.     JEANINE ROBERTS heard TAWNNEY CALDWELL talk about having fake birth certificates for her children and having ties to South America.

14.     JAMES HARMON has been interviewed on multiple occasions as part of the investigation. JAMES HARMON identified that TAWNNEY CALDWELL and STERLING ROBERTS arrived at his residence on August 14, 2017 and departed on the morning of August 15, 2017. They arrived and departed in a Dodge Durango that TAWNNEY CALDWELL was

driving. JAMES HARMON provided the following information about the events that occurred during this time period:

a.   JAMES HARMON had previously heard TAWNNEY CALDWELL and CHANDRA HARMON talk about wanting ROBERT CALDWELL dead. TAWNNEY CALDWELL and CHANDRA HARMON also said that TAWNNEY CALDWELL had asked her children if they would be okay if their father (ROBERT CALDWELL) was dead.   According to TAWNNEY CALDWELL and CHANDRA HARMON, the children said they would be okay if ROBERT CALDWELL died even if it meant that TAWNNEY CALDWELL would be in jail for a long time.

b.   While at JAMES HARMON's residence, STERLING ROBERTS said that he tried to kill ROBERT CALDWELL approximately one week prior.   STERLING ROBERTS said that he had set up a meeting for a potential job with ROBERT CALDWELL, and that STERLING ROBERTS was going to shoot ROBERT CALDWELL with a pistol. According to STERLING ROBERTS, ROBERT CALDWELL sped out of the area after figuring out what was transpiring.  This description of events is consistent with the confrontation between STERLING ROBERTS and ROBERT CALDWELL on or around August 5, 2017 in Jamestown, Ohio (as detailed above).

c.   On August 14, 2017, STERLING ROBERTS said that he knew where ROBERT CALDWELL was going to be located at some point in the future.  Although STERLING ROBERTS was speaking in a cryptic manner, JAMES HARMON understood this to mean that STERLING ROBERTS was indicating that he planned to kill ROBERT CALDWELL.

d.   Also on August 14, 2017, TAWNNEY CALDWELL asked JAMES HARMON to sell STERLING ROBERTS a rifle. TAWNNEY CALDWELL knew that JAMES HARMON needed money and suggested that he make the sale for the financial gain.   Although JAMES HARMON knew that STERLING ROBERTS was a convicted felon, JAMES HARMON nevertheless sold STERLING ROBERTS an AK-47 rifle for approximately $120 to $140. TAWNNEY CALDWELL provided the cash that was used for the purchase. STERLING ROBERTS said that he would lie and say that he stole the gun from JAMES HARMON if he was ever caught with it in the future.

e.   After the sale of the AK-47 rifle, JAMES HARMON asked TAWNNEY CALDWELL to help him purchase marijuana.  TAWNNEY CALDWELL, STERLING ROBERTS, and JAMES HARMON thereafter drove together to CHANCE DEAKIN's and CHRISTOPHER ROBERTS' residence in Dayton, Ohio.  They departed during the late evening hours of August 14, 2017. JAMES HARMON drove his vehicle.  TAWNNEY CALDWELL paid to fill up JAMES HARMON's vehicle with gasoline during the trip to or from Dayton.

f.  When they arrived at the house in Dayton, CHRISTOPHER ROBERTS, CHANCE DEAKIN, and two unknown females were at the house. STERLING ROBERTS asked CHANCE DEAKIN for "my 40" and said that he wanted it cleaned. CHANCE DEAKIN at first did not want to provide the gun, but STERLING ROBERTS demanded it. CHANCE DEAKIN returned to the room with what appeared to be a Smith and Wesson handgun that was silver and black in color (which is consistent with the handgun described by Female A above). CHANCE DEAKIN and JAMES HARMON cleaned the handgun, and CHANCE DEAKIN gave it to STERLING ROBERTS. CHRISTOPHER ROBERTS was present when the gun was cleaned and provided to STERLING ROBERTS.

g.  Also while at the house in Dayton, TAWNNEY CALDWELL arranged to purchase marijuana from CHRISTOPHER ROBERTS for approximately $100. CHRISTOPHER ROBERTS provided both marijuana and Lysergic Acid Diethylamide (commonly known as LSD or acid) to JAMES HARMON. TAWNNEY CALDWELL also talked about providing CHANCE DEAKIN and CHRISTOPHER ROBERTS with a handgun in the future.

h.  JAMES HARMON, STERLING ROBERTS, and TAWNNEY CALDWELL departed from the house in Dayton around 3:00 a.m. on August 15, 2017. STERLING ROBERTS had the Smith and Wesson handgun when they departed. They all traveled back to JAMES HARMON's residence in Kentucky.

i.  STERLING ROBERTS and TAWNNEY CALDWELL departed from JAMES HARMON's residence during the morning hours of August 15, 2017.

j.  JAMES HARMON maintained 40-caliber ammunition in his residence. Sometime after STERLING ROBERTS left, JAMES HARMON noticed that some of the rounds of ammunition were missing from one of his boxes. JAMES HARMON therefore assumed that STERLING ROBERTS had taken some of the ammunition from this box. A number of weeks later, JAMES HARMON also found a Smith and Wesson handgun that did not belong to him in his gun safe. He was concerned that this gun may have been put into his safe by STERLING ROBERTS. JAMES HARMON provided the Smith and Wesson handgun and the box containing the missing ammunition to law enforcement officers. Officers noted that the rounds of ammunition remaining in the box were stamped "Federal" and "40" and "S&W".

15.  Records from both a Walmart store in Lebanon and Chase Bank identified that TAWNNEY CALDWELL's Visa debit card was utilized to purchase a TracFone cellular telephone at the Walmart store in Lebanon around 12:26 p.m. on August 15, 2017. Surveillance footage was obtained for this transaction, and the footage appears to depict TAWNNEY CALDWELL making the purchase. Another individual is depicted in the surveillance footage

who was near TAWNNEY CALDWELL, although he was only captured from the waist down. The physical appearance of this individual is consistent with STERLING ROBERTS.

16.     As part of the custody dispute involving ROBERT CALDWELL's and TAWNNEY CALDWELL's children, the Magistrate Judge ordered that ROBERT CALDWELL and his three children attend counseling services one time per week at an office in the Cornerstone Building located at 4134 Linden Avenue in Riverside, Ohio. Confirmations of the dates and times for these appointments were provided via text messages to both ROBERT CALDWELL and TAWNNEY CALDWELL. As such, TAWNNEY CALDWELL was aware of the dates and times of the appointments.

17.     ROBERT CALDWELL and the three sons had a counseling appointment at the Cornerstone Building on August 15, 2017. Surveillance footage that captured the Cornerstone Building identified that ROBERT CALDWELL and two of the sons arrived for the appointment at approximately 4:02 p.m., and the third son arrived approximately ten to fifteen minutes later.

18.     Surveillance footage that captured the Cornerstone Building revealed that a white male walked up to the building at approximately 4:02 p.m. on August 15, 2017. Officers and other witnesses (including family members and friends of STERLING ROBERTS) who have reviewed this footage have concluded that the individual in the footage is STERLING ROBERTS. The surveillance footage captured STERLING ROBERTS walk up to the front of the building on two occasions and walk around ROBERT CALDWELL's vehicle. At approximately 5:25 p.m., the surveillance footage captured STERLING ROBERTS crouching down next to a mailbox near the front entrance, where he remained until approximately 5:57 p.m.

19.     Three women who arrived at the Cornerstone Building shortly before 5:57 p.m. were later interviewed by officers. All three women reported seeing a male squatting down by the

mailbox, and two of the women reported seeing the man talk on a cellular telephone. One of the women reported that she heard the man say something to the effect of "I've already been waiting 15 minutes" while using his cellular telephone.

20. The surveillance footage captured ROBERT CALDWELL and his three sons exiting the Cornerstone Building at approximately 5:57 p.m. Immediately thereafter, the surveillance footage captured the man believed to be STERLING ROBERTS quickly get up from his squatting position and run toward ROBERT CALDWELL with his arm outstretched, appearing to fire shots from a handgun. ROBERT CALDWELL fell to the ground, and his sons fled the scene. STERLING ROBERTS stood between ROBERT CALDWELL's legs and appeared to continue shooting ROBERT CALDWELL in the head. STERLING ROBERTS then fled the scene.

21. Officers and paramedics were dispatched to the Cornerstone Building at approximately 6:00 p.m. Officers observed multiple gunshot wounds on ROBERT CALDWELL's head, upper torso, and arms. He was pronounced deceased at approximately 6:11 p.m. Among other items, officers collected approximately fourteen shell casings that were a mixture of brass and silver color. The silver casings were stamped with "Federal", "40", and S&W". These stamps are consistent with the ammunition that JAMES HARMON found missing from his residence and which he turned over to officers (as detailed above). The brass casings were stamped with "R-P", "40", and "S&W".

22. Interviews of two witnesses determined that CHANDRA HARMON conducted the following activities on the evening of the homicide of ROBERT CALDWELL:

23. At the request of officers of the Riverside Police Department, deputies from the Montgomery County (Ohio) Sheriff's Office arrived at TAWNNEY CALDWELL's residence at

approximately 8:20 p.m. to search for STERLING ROBERTS.  As deputies approached the house, they observed TAWNNEY CALDWELL and CHANDRA HARMON near TAWNNEY CALDWELL's vehicle.  Deputies observed that the vehicle contained a lot of belongings, and it appeared to the deputies that TAWNNEY CALDWELL and CHANDRA HARMON were attempting to leave.  TAWNNEY CALDWELL claimed to have seen STERLING ROBERTS "earlier in the day" but would not provide additional information.  She was thereafter transported to the Riverside Police Department by deputies.

24.     Upon arrival at the Riverside Police Departments, officers asked for TAWNNEY CALDWELL's cellular telephone.  She refused to turn over the phone and attempted to do something to it before officers removed it from her possession.  She thereafter agreed to be interviewed after being advised of her Miranda rights.  Below is a summary of information provided by TAWNNEY CALDWELL during the interview:

    a.    TAWNNEY CALDWELL claimed that she had not seen or talked to STERLING ROBERTS since earlier in the morning.  She claimed to not know his current whereabouts.

    b.    TAWNNEY CALDWELL discussed at length her relationship with ROBERT CALDWELL, various alleged abuse committed by him, and their custody dispute.

    c.    When asked about the confrontation between STERLING ROBERTS and ROBERT CALDWELL in Jamestown, Ohio, TAWNNEY CALDWELL advised that she did not believe the incident occurred.

    d.    Officers told TAWNNEY CALDWELL that ROBERT CALDWELL had been shot.  TAWNNEY CALDWELL responded that she did not think that STERLING ROBERTS was capable of shooting or hurting anyone.

    e.    In an attempt to determine STERLING ROBERTS' whereabouts, officers asked TAWNNEY CALDWELL about the names of STERLING ROBERTS' brothers and the address of his mother.  TAWNNEY CALDWELL claimed that she did not know the brothers' last names and did not know JEANINE ROBERTS' address.  TAWNNEY CALDWELL reported that STERLING ROBERTS had gone to JEANINE ROBERTS' residence in Tennessee the previous week, but TAWNNEY

CALDWELL failed to disclose that she was also there.

    i.    As detailed above, TAWNNEY CALDWELL had picked up STERLING ROBERTS from JEANINE ROBERTS' residence a few days prior after JEANINE ROBERTS texted her address to TAWNNEY CALDWELL. It is therefore reasonable to believe that TAWNNEY CALDWELL was being untruthful with officers about her knowledge of STERLING ROBERTS' relatives in an attempt to conceal his possible whereabouts.

    f.    TAWNNEY CALDWELL claimed that she did not know what car STERLING ROBERTS was currently driving. When asked if he was driving a Mitsubishi Eclipse and who owned the vehicle, TAWNNEY CALDWELL responded that she did not want to answer the question. She thereafter terminated the interview.

    g.    The interviewing officers noted that TAWNNEY CALDWELL never inquired about ROBERT CALDWELL's condition during the interview. Before TAWNNEY CALDWELL departed, they informed her that ROBERT CALDWELL was deceased. She inquired if her sons had witnessed the shooting, and she was informed that they did. The interviewing officers noted that TAWNNEY CALDWELL did not appear to be surprised or distressed about this information.

25.    During interviews of JAMES HARMON, he identified that STERLING ROBERTS traveled to Burlington, Kentucky during the evening after the homicide. Below is a summary of information provided by JAMES HARMON regarding the visit:

    a.    On the evening of August 15, 2017, JAMES HARMON received a telephone call from TAWNNEY CALDWELL. She told him that she was in the back seat of a police cruiser but did not tell him why.

    b.    Later on in the evening of August 15, 2017, STERLING ROBERTS called JAMES HARMON. STERLING ROBERTS asked if he could fix his vehicle at JAMES HARMON's residence, and JAMES HARMON agreed. STERLING ROBERTS arrived in a Mitsubishi Eclipse vehicle (consistent with the vehicle purchased by TAWNNEY CALDWELL in July 2017).

    c.    Although they did not specifically discuss it, JAMES HARMON presumed that STERLING ROBERTS had killed ROBERT CALDWELL based on the telephone call from TAWNNEY CALDWELL, previous discussions, and STERLING ROBERTS' behavior. STERLING ROBERTS asked to replace a fuse on his vehicle and take a shower. JAMES HARMON agreed and went to a different part of his residence while STERLING ROBERTS conducted these activities.

    d.    Before leaving, STERLING ROBERTS asked JAMES HARMON for a cellular telephone. JAMES HARMON provided a pre-paid cellular telephone that he had in his possession to STERLING ROBERTS. When STERLING ROBERTS was

leaving, JAMES HARMON told STERLING ROBERTS "way to step up" (or words to that effect) as a congratulatory comment about the homicide.

e.    After STERLING ROBERTS departed, JAMES HARMON noticed that STERLING ROBERTS had left his clothing outside of the shower. JAMES HARMON burned the clothing at his residence in Kentucky. JAMES HARMON later saw surveillance photographs that had been released by the media that depicted STERLING ROBERTS at the homicide scene, and JAMES HARMON believed that the clothing STERLING ROBERTS left outside of the shower was the clothing he wore during the homicide.

26.    On or around August 19, 2017, STERLING ROBERTS was arrested in Spartanburg, South Carolina after he confronted and fired shots at a deputy outside of a gas station. STERLING ROBERTS utilized an AK-47 rifle during this shooting. After additional deputies arrived, STERLING ROBERTS surrendered and was taken into custody. The AK-47 rifle was recovered, and a trace report from the Bureau of Alcohol, Tobacco, and Firearms (ATF) identified that it was purchased by JAMES HARMON. Therefore, it is reasonable to believe that STERLING ROBERTS utilized the rifle he purchased from JAMES HARMON on August 14, 2017, after transporting it from Kentucky to Ohio and ultimately to South Carolina. It was noted that at the time of his arrest, STERLING ROBERTS was wearing shoes that appeared very similar to the shoes worn during the homicide of ROBERT CALDWELL, as captured in the surveillance footage.

27.    The 2003 Mitsubishi Eclipse that was purchased by and registered to TAWNNEY CALDWELL was found at the scene of the shooting in Spartanburg, South Carolina. Subsequent searches of this vehicle and STERLING ROBERTS' person did not locate any additional firearms or cellular telephones. As such, it appears that he had disposed of the cellular telephone he used during the homicide, the cellular telephone provided to him by JAMES HARMON, and the handgun that was used to murder ROBERT CALDWELL. A search of the vehicle located a pair of sunglasses that appeared to be very similar to the sunglasses worn by STERLING ROBERTS during the homicide of ROBERT CALDWELL, as captured in the surveillance footage.

28.     During his arrest, STERLING ROBERTS told deputies that he was a suspect in a homicide in Ohio. STERLING ROBERTS claimed that he was being "framed". STERLING ROBERTS was interviewed by deputies of the Spartanburg County (South Carolina) Sheriff's Department later on August 19, 2017, after being advised of his Miranda Rights. The interview was video and audio recorded. Below is a summary of information provided by STERLING ROBERTS during this interview:

a.     When shown a still image of the suspect from the shooting of ROBERT CALDWELL at the Cornerstone Building, STERLING ROBERTS admitted that he was the individual depicted in the image. However, STERLING ROBERTS denied that he shot ROBERT CALDWELL. STERLING ROBERTS admitted that he had been at the Cornerstone Building. STERLING ROBERTS claimed that because the door was locked, he went to a neighboring business and then to a friend's house.

b.     STERLING ROBERTS stated that he had thrown his cellular telephone out the car window sometime during the trip to South Carolina.

c.     When providing STERLING ROBERTS with a cigarette break (which was not recorded), STERLING ROBERTS told the deputy that he was glad that ROBERT CALDWELL was dead. STERLING ROBERTS noted that he would not say this while he was being recorded.

29.     STERLING ROBERTS was interviewed again by detectives of the Riverside Police Department on or around August 29, 2017, after being advised of his Miranda rights. The interview was video and audio recorded. Below is a summary of information provided by STERLING ROBERTS during the interview:

a.     STERLING ROBERTS admitted that he had met with ROBERT CALDWELL in Jamestown, Ohio earlier in the month. However, STERLING ROBERTS denied that he tried to kill ROBERT CALDWELL when they met.

b.     STERLING ROBERTS advised that he fled Ohio because he knew there were outstanding warrants for his arrest. STERLING ROBERTS advised that he had intended to drive to Jacksonville, Florida. He had seen the news about ROBERT CALDWELL's murder and the fact that he was a suspect while he was in Nashville, Tennessee.

c.     When shown a still image from the surveillance footage of the suspect from the

shooting of ROBERT CALDWELL, STERLING ROBERTS admitted that he was the individual captured in the image. STERLING ROBERTS claimed that he was at the building to look into the possibility of seeking treatment for his drug addiction. STERLING ROBERTS denied that he shot ROBERT CALDWELL.

d.  STERLING ROBERTS knew that ROBERT CALDWELL and his sons received counseling at the Cornerstone Building, as he had driven the sons there on past occasions. STERLING ROBERTS denied knowing that ROBERT CALDWELL and the sons had an appointment the day of the shooting.

e.  STERLING ROBERTS said that he was upset about the custody dispute between TAWNNEY CALDWELL and ROBERT CALDWELL and the impact it had on TAWNNEY CALDWELL.

30.  On or around November 17, 2017, at the direction of law enforcement, JAMES HARMON agreed to meet with and conduct consensual recordings with TAWNNEY CALDWELL and CHANDRA HARMON. During these recorded conversations, both TAWNNEY CALDWELL and CHANDRA HARMON provided JAMES HARMON with various instructions on what to tell law enforcement officers if he was ever questioned about events surrounding the rifle he sold to STERLING ROBERTS or the gun that STERLING ROBERTS obtained from CHANCE DEAKIN's and CHRISTOPHER ROBERTS' house. In addition, JAMES HARMON discussed a gun that he found at his house that he thought STERLING ROBERTS may have left there. CHANCE DEAKIN instructed JAMES HARMON to dispose of this gun.

31.  On or around November 29, 2017, at the direction of law enforcement, JAMES HARMON agreed to meet with and conduct a consensual recording with CHANCE DEAKIN and CHRISTOPHER ROBERTS. During the recording, JAMES HARMON and CHANCE DEAKIN discussed the gun that they cleaned for STERLING ROBERTS the day before the homicide. CHRISTOPHER ROBERTS also talked about the gun that TAWNNEY CALDWELL was purportedly supposed to provide him and CHANCE DEAKIN in exchange for the gun provided to STERLING ROBERTS. Furthermore, JAMES HARMON discussed a gun that he found at his

house that he thought STERLING ROBERTS may have left there. CHANCE DEAKIN instructed JAMES HARMON to dispose of this gun.

32.    Following the homicide of ROBERT CALDWELL, his parents were awarded custody of the three children. TAWNNEY CALDWELL was forbidden from having any unsupervised contact with her three children, including by telephone.

33.    During the late evening hours of August 21, 2017, following the funeral of ROBERT CALDWELL, Minor Male B left his grandparents' residence without their permission or knowledge. His whereabouts have been unknown since that time. During an investigation conducted by the Sugarcreek Township (Ohio) Police Department, officers have attempted to interview and obtain information from TAWNNEY CALDWELL and other family members. Officers have noted that TAWNNEY CALDWELL and some of the family members have been uncooperative and/or refused to answer questions. Several individuals have told officers that Minor Male B was staying with family members of TAWNNEY CALDWELL, and that the family members were attempting to conceal his whereabouts.

34.    Also during the course of the investigation of Minor Male B's disappearance, the following information was learned by the Sugarcreek Township Police Department:

    a.    On or around August 29, 2017, Minor Male A's grandparents found Minor Male A in possession of a cellular telephone. Minor Male A told officers that TAWNNEY CALDWELL had given this telephone to a friend, who then arranged for it to be given to Minor Male A. As noted above, the court had forbidden TAWNNEY CALDWELL from having any unsupervised contact with the children. Review of the device determined that it was a pre-paid Simple Mobile TracFone. The Uber application (a transportation and food delivery application available on mobile devices) was on the phone, and TAWNNEY CALDWELL's credit card was connected to the application. In addition, TAWNNEY CALDWELL's cellular telephone number was saved in the phone under the letter "Q". The friend involved in providing the phone to Minor Male A was also contacted, and this friend confirmed that TAWNNEY CALDWELL had in fact given him the phone and asked him to provide it to Minor Male A.

    b.    Officers learned that on or around December 16, 2017, TAWNNEY CALDWELL and her aunt met with Minor Male A at a Panera restaurant in Sugarcreek Township, Ohio, again contrary to the court order. Surveillance footage from the restaurant was obtained by officers, and this footage captured the meeting. Minor Male A told officers that he had communicated with TAWNNEY CALDWELL via Instagram. Although Minor Male A was vague about how he communicated with TAWNNEY CALDWELL on Instagram, one of his friends who was with him on December 16, 2017 told officers that TAWNNEY CALDWELL sent Minor Male A photographs of where she was to signify where she wanted him to meet her. Minor Male A told investigators that when he met with TAWNNEY CALDWELL on December 16, 2017, she indicated that Minor Male B was likely in California.

35.    Minor Male A has been interviewed on several occasions pursuant to the investigation. In addition to the information noted above, Minor Male A provided the following information:

    a.    Minor Male A denied that TAWNNEY CALDWELL ever talked to him about plans to murder ROBERT CALDWELL.

    b.    A few weeks after ROBERT CALDWELL obtained custody of Minor Male A and his brothers, TAWNNEY CALDWELL talked to them about taking a cruise to Mexico and never returning.

    c.    TAWNNEY CALDWELL had instructed him and his brothers to behave poorly when living with their grandparents so that the grandparents would give up custody of them. TAWNNEY CALDWELL also instructed Minor Male A not to take his prescribed medication. TAWNNEY CALDWELL referred to this as "plan B". TAWNNEY CALDWELL had sent a text message to Minor Male A stating "bbbbb" (or something to that effect) to remind him to behave poorly.

36.    Through the course of interviews of friends and relatives of the identified subjects and review of various telephone records, law enforcement officers identified that TAWNNEY CALDWELL and/or STERLING ROBERTS utilized telephone number 937-234-3818, with service provided by Verizon. On or around January 26, 2018, records were received from Verizon for this telephone number pursuant to a court order authorized by the United States District Court for the Southern District of Ohio. The incoming and outgoing call detail records received pursuant to the court order revealed that telephone number 937-234-3818 exchanged approximately nine

telephone calls with telephone number **270-363-8919** on August 15, 2017, during the approximate time period of 5:01 p.m. to 6:19 p.m. The total call duration for these calls was approximately five minutes and fifteen seconds. As detailed above, ROBERT CALDWELL was shot at approximately 5:57 p.m. on August 15, 2017. Also as detailed above, two witnesses reported seeing the man identified as STERLING ROBERTS talking on a cellular telephone outside of the Cornerstone Building just prior to the shooting.

37. Law enforcement officers identified that telephone number **270-363-8919** was assigned to TracFone Wireless' network, with service provided by T-Mobile. Records received from TracFone Wireless identified that the telephone assigned to this number was purchased at a Walmart store in Lebanon, Ohio. Records from Walmart identified that the telephone was purchased using a credit or debit card on August 15, 2017, at approximately 12:20 p.m. (approximately five and a half hours before the homicide of ROBERT CALDWELL). Records from Chase Bank identified that the card number used to purchase the telephone at Walmart was a debit card in TAWNNEY CALDWELL's name. Given that the telephone was purchased shortly before the homicide and was used to communicate with a telephone number utilized by TAWNNEY CALDWELL and/or STERLING ROBERTS directly before, during, and after the homicide, it appears that this number was used as an instrumentality of the crime.

38. As detailed above, STERLING ROBERTS, TAWNNEY CALDWELL (also known as TAWNNEY THOMAS), CHANDRA HARMON, JAMES HARMON, CHANCE DEAKIN (also known as CHANCE ROBERTS), CHRISTOPHER ROBERTS, and others unknown are being investigated for ITAR, firearms, witness intimidation, UFAP, conspiracy, kidnapping, and other related offenses. Cell tower and sector information can be materially relevant in investigations involving these offenses. This information provides evidence of the

types of travels detailed above and helps determine whether or not a subject, witness, or victim was at the scene of a crime. Data regarding the subjects' or witness' whereabouts obtained from cell site information can corroborate statements and provide evidence of the locations of the criminal activities. As such, the cell tower and sector information for the cellular telephone identified above may provide material information in identifying who utilized the telephone. Furthermore, the cell tower and sector information for the cellular telephone may provide material information in identifying or corroborating other information and events relevant to the investigation (such as travels conducted by the subjects in furtherance of their criminal activities and locations of the criminal activities).

39. Transactional records (such as incoming and outgoing call details, text message details, and other records) can be materially relevant in investigations involving conspiracies to commit the criminal offenses listed above. Because co-conspirators often communicate with each other before, during, and after the criminal offenses via cellular telephones, the transactional records can provide evidence of these communications and lead to the identification of co-conspirators. Subscriber information and billing records maintained by telephone providers also provide material evidence of the above noted offenses. Such information is significant in that it helps in determining the identities of the users of the telephones.

<u>REQUEST FOR ORDER</u>

40. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, to determine the nature and scope of their activities, to corroborate or refute statements made by

them or other witnesses, and identify the locations of criminal activities. Accordingly, the United States requests that **T-MOBILE** be directed to produce all items described in Part II of Attachment A to the proposed Order.

41.     The United States further requests that the Order require **T-MOBILE** not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for a period of one year. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the disclosure could seriously jeopardize the investigation, including by giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates.  The investigation also relates to the disappearance and possible kidnapping of a minor child, and alerting the targets may put the child in danger. *See* 18 U.S.C. § 2705(b).


//

//

//

//

//

//

42.     The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court.  As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney


s/Amy M. Smith
AMY M. SMITH (0081712)
Assistant United States Attorney
Attorney for Plaintiff
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
E-mail: Amy.Smith2@usdoj.gov

## ATTACHMENT A

### I. The Account(s)

The Order applies to records and information associated with the cellular telephone assigned call number **270-363-8919** (the "Account").

### II. Records and Other Information to Be Disclosed

**T-MOBILE** is required to disclose the following records and other information, if available, to the United States for each Account listed in Part I of this Attachment, for the time period May 1, 2017 to the present:

    A.    The following information about the customers or subscribers of the Accounts:

        1.    Names (including subscriber names, user names, and screen names);

        2.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        3.    Local and long distance telephone connection records;

        4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        5.    Length of service (including start date) and types of service utilized;

        6.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

        7.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        8.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.    For all voice, SMS, and data activity: All records and other information (not including the contents of communications) relating to wire and electronic communications sent from or received by the Accounts, including the date and time of the communications, the method of communications, and the source and destination of the communications (such as source and destination email addresses, IP addresses, and telephone numbers); including all incoming and outgoing call details and SMS details; including all log files and messaging logs; and including information regarding the cell towers and sectors through which the communications were sent or received.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by **T-MOBILE**, and my official title is _____. I am a custodian of records for **T-MOBILE**. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of **T-MOBILE**, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

   a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

   b. such records were kept in the ordinary course of a regularly conducted business activity of **T-MOBILE**; and

   c. such records were made by **T-MOBILE** as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____       _____
Date                                 Signature